BENJAMIN HARRIS, father of the plaintiff Sarah, of five other daug'hters, and of the defendents Benjamin Harris and William Wager Harris, seized of valuable lands, possessed of a number, between fifty and sixty, of slaves, and intitled to credits, amounting to about one thousand pounds, by his testament, in april, of the year one thousand seven hundred and seventy six— after devising and bequeathing part of his estate to his wife, to be holden during her life, in satisfaction of her dower; after devising and bequeathing to his sons his most profitable lands, and his slaves and personal estate, except the parts thereof given to his wife and daughters; and after bequeathing to his daughters Mary Spencer and Hinson Wager Moseley, who is supposed to be the wife of the defendent Edward Mosely, each, one hundred pounds, current money, to be raised out of the profits of his estate, and four ymung negroes, and to Mary Spencer a bed and furniture, or ten pounds, current money, — bequeathed to his daughters, Phoebe, Edith, the plaintiff Sarah, and Nancy Hinson Wager, each, one hundred pounds, current money, to be paid within twelve months after they should respectively attain their ages of eighteen years, or marry, also two hundred pounds more, of like money, when they could be conveniently raised from the profits of his estate, to be paid at the discretion of his executors, also four young negroes, and a bed and furniture, or ten pounds; declared his will to be, that his son Benjamin pay to his son William Wager three hundred pounds, current money, in regard the estate given to the former was more valuable than that given to the latter; *devised three lots of land in Manchester to his sons, and ten thousand acres of land in *175 Transylvania to his eight children ; directed all his estate to be kept together for paying off the money legacies, for maintenance of his family, and for education of his children, until his son Benjamin, or, in case of his death, until his other son should attain the age of twenty one years; and appointed the defendants Abraham Salle, Edward Moseley, and Bernard Markham, with Samuel Nivins, of whom the ¡ast is supposed to be dead, because, after proving the testament, nothing more appeareth to have been done by him, executors.
Before depretiation was perceptible the testator died; for in September, 1776, a certificate for obtaining the probate of his testament was granted.
A few months afterwards, the plaintiff Sarah chose the defendent Abraham Salle her guardian, and in august 1777, attained the age of eighteen years.
The defendents Edward Mosely and Barnard Markham voluntarily tendered to the guardian of the plaintiff Sarah, on the 12 day of September, 1778, one hundred pounds, and on the 31 day of august, 1779, two hundred pounds more, both in depreti-ated money, and required him to receive them in discharge of the money legacies of his ward, the defendent Edward Moseley proposed to tender Nancy Harris’s legacy to her guardian Thomas Harris, who refused to receive it in paper money; and it was afterwards paid in specie.
The guardian of the plaintiff Sarah was unwilling to receive the paper money, and wished to have declined it, but thought himself compelled, by the laws of the country, to take it, when payment was offered; and received it accordingly, so soon as the money was paid to him, he lent out two hundred pounds upon interest, and was compelled, as he says, to receive them again, much against his inclination, and could not lend out the money afterwards, he offered the whole three hundred pounds to the plaintiff Sarah, when she attained full age, which she refused to accept, and then he funded the paper money.
No other legatary, besides the plaintiff Sarah, sustained, considerable, if any, loss, from depretiation.
The plaintiffs brought their bill for the wifes legacy, to be paid by the executors of her father, or by the sons, whose estates were chargeable with it.
The executors, in their answer, admit the facts before stated and the two, who tendered the paper money, say, ‘they thought themselves bound by their duty, and in obedience to the will of their testator, to tender the legacy so soon as the estate was in circumstances to pay the same that the plaintiff; Sarah, before *they paid her legacy, informed them she wished to receive it, that she might draw interest upon it; and that the defendent Bernard Markham advised her not to take it. and they admit that they have bond, belonging to the estate of their testator, still in their possession, to the amount of little, more than two hundred pounds, and that they have given up to the other defend-ents a large personal estate.
And those other defendents, the sons, in their answer, clame the benefit of the payments to the guardian, conceiving the clame i to be just, because the estates, received from , their father, had been injured, as they allege, by payments in paper money to the executors about the time of discharging the legacy.
By accounts, to which the executors refer, the testators credits, by bond and a note of hand, at the time of his death, amounted to seven hundred and seventy seven pounds five shillings and seven pence, supposed to be principal money, of these credits; the executors received from Hannah Easley, on the 5 day of march, 1777, two pounds, from John Short, on the 8 day of may 1779, sixty one pounds and fifteen shillings, from James Harris, on the 25 day of June, 1780, one hundred and fifty pounds ten shillings and seven pence, and from John Scott, on the 8 day of december, 1785, sixteen pounds and ten shillings, so that of the credits five hundred and forty seven pounds had not been received by the executors, and, according to their answer, the securities for payment of that remainder, with many years interest, the first of them being dated in 1768, and the last of them on the 2 day of august, 1776, were retained by the executors, or ‘given up’ to their friends the sons. — and the other credits, by payments of which in paper money the sons pr'etended the estates given them by their father to have been reduced, arose from sales by his executors after his death; so that the estate, in the hands of such thrifty managers, probably gained as much as it lost by depretiation. two months before the tender of the two hundred pounds to the plaintiff Sarahs guardian, the executors received four hundred pounds for one horse, sold to John Harris, supposed to be the horse valued by a witness at thirty-five pounds in specie, and one month after that tender, received two hundred pounds for less than nine hundred and sixty pounds of tobacco sold to Francis Locket, but if the payments in paper money were detrimental to the estate, the contrivance of executors, entrusted for the benefit of all the children, to burthen one of them with nearly the whole loss, was as nefarious, as the retention of the iniquitious gain by her brothers was rigorous.
The cause was heard on the first day of june, in the year *1792, when the opinion of the court was declared to be, that the plaintiffs were bound by the receipt of the guardian of the plaintiff Sarah of one hundred pounds, part of the three hundred pounds bequeathed to her; but that the plaintiffs were intitled to the residue of that legacy, with interest, and the court decreed the executors to pay to the plaintiffs two hundred pounds, with interest thereupon from the first day of january, one thousand seven hundred and eighty two, and costs.
The distinction in the decree between the *176 payment of the one hundred pounds and the payment of the two hundred pounds was afterwards thought to be grounded on a false principle, unnecessary to be here explained; and,
On the 26 d¡ay of September, in the same year, the decree, by consent of parties, was reviewed, and the court, partly reversing it, decreed the executors, out of the estate of their testator, in their hands to be administered, to pay to the plaintiffs the whole three hundred pounds, bequeathed to the plaintiff Sarah by the testament of her father, after deducting therefrom the payments to the guardian, according to the true value thereof at the times of payment, with interest from the times when she was intitled to receive her legacy, an account of the payments and interest was directed to be stated by a commissioner, upon whose report the sons would have been decreed to pay so much of the legacy and interest as exceded the effects in the hands of the executors.
He who awarded this decree was not moved, in forming it, as hath been supposed, by compassion* for an orphan CON-EESSED† to have been INJURED† by those who ought to have protected her, but was moved by these considerations:
I. The money bequeathed to the plaintiff was intended by her father to be equal in value to the money current at the date of his testament, which was of the same value, or nearly of the same value, as thé money current when the decree was pronounced, for.
Eirst, he did not know that, between that time, and the times appointed for payment of the legacy, the comparative value of money would vary more than the comparative values of other commercial subjects; and
Secondly, the testament itself exhibited a criterian for adjusting the value of the money legacies, which indicates the value contemplated by the testator to have been the value of money current when he was bestowing them, the parts of the testament, to which this observation al-ludeth, are those by *which were bequeathed a bed and furniture, OR TEN POUNDS, to one married daughter, and'the same to each of the daughters unmarried; and by which the son Benjamin was enjoined to pay THREE HUNDRED POUNDS to his brother, in order that their ESTATES might be more nearly EQUAE IN VAEUE. whence may be inferred, that the testator intended, that every ten pounds of the portions to his daughters should be equal in value to a bed and furniture; and that the three hundred pounds legacy to each daughter should be equal to the three hundred pounds, to be paid by one of the sons to the other; and did not intend that his son Benjamin, by payment to his brother, in december, 1781, of three hundred pounds, at that time worth, by legislative estimation, not more than a dollar, and, by vulgar estimation, nothing, should discharge the obligation to make the estates of both equal.
One may ratiorialy suppose, that the testator, if he had foreboded those events, by which the comfortable provision, as he thought, for his daughter, became unworthy her acceptance, would have bequeathed to her portions of the fruits to be yielded by his estate, equal to the value of the money, by which be expected she could procure-those fruits, which might have been effected, without impairing the capital funds devoted by him to the use of his other children; that he would have estimated the substitute for money by some ratio analogous with that observed in the instance of the bed and furniture, and of the difference in value between the estates given to the two sons; or that he would have provided for her otherwise, in some such manner as that she, and of all his family she only, should not be deprived of more than half the portion which he wished her to enjoy.
So that the executors, who say, ‘they thought themselves bound, by their duty, and in obedience to the will of their testator, to tender the said legacy, so soon as the estate was in circumstances to pay the same,’ if they did think so, manifestly misinterpreted that will, according to their interpretation, the testator, who, providing for the support of a child, after she probably would leave his family, where he had directed her to be maintained during the minority of his sons, or one of them, bequeathed to her one hundred pounds, to be paid within twelve months after she should be eighteen years old, and two hundred pounds more, ‘when the same could be CONVENIENTLY RAISED from the profits of his estate, to be paid at the DISCRETION of his executors’ — the testator willed that this child should be defrauded of her portion ; — that when the calamities of war and emergencies unforeseen, without diminution *of his estate, or the profits thereof, should reduce the paper money, uttered after his death, to little more than a shadow of what it pretended to be, the testator willed those executors, in their DISCRETION to sham this child with a payment in that money, because they could conveniently RAISE more of' it than was sufficient, by selling one of his beasts, or a hogshead and a half of tobacco.
II. The guardian, who was one of the executors, knew that his ward would be injured by receiving, for no other reason can be assigned for his unwillingness to receive, the paper money ; another of them Bernard Markham advised the plaintiff Sarah not to take the paper money, which advice could only be justified by the like reason ; and the other, who was the most eager and active of the triumvirate in this foul business, knew that she would be injured by the payment of paper money, for he is proved by *177 a witness to have avowed the design of payments to some of the daughters, in that manner, to have been, that thereby the sons might get almost all the estate; which design was contrary to the maxim jare naturae aeqmim est, neminent, cum alterius detri-mento et injuria, fieri locupletiorem, (Dig. Tib. R. tit. XVII. reg. ccvi) ; was contrary to his duty, requiring him to be the friend of all the children equaly; and was the more blameable, if he were the husband of one of the legataries, who appeareth, by the accounts before mentioned, to have received her legacy in 1776, and therefore not depretiated. when those who are empowered to perform an act know that injustice will be done, injustice not foreseen by their constituent, arising from causes existence, of which even in embryo were not contemplated by him, and injustice, against which, if he had foreseen it, he would have provided, and when, on the other hand injustice will not happen from nonperformance, which appeareth to have been precisely the case here, execution of the power ought to be suspended until the causes, if they be temporary, shall cease to operate, or, if they be permanent, until the difficulty can be solved by competent authority, if the zeal of the two executors would have suffered them to postpone, or the guardian had been as dexterous as Thomas Harris was in parrying, the tenders, for sixteen months only, the young woman might have escaped the barbarous spoliation insidiously meditated against her. and when execution of a power, in such peculiar circumstances, shall have intervened, especialy if fraud and oppression shall have accompanied it, the court of equity, vacating the act, and restoring all parties to the state in which they would have been, if the agents had remained quiescent, fulfills one of the main purposes of its institution, and doth not transcend the limits of its province.
*111. If the testator did intend the legacies to his daughter to be paid in money, equivalent to the money current in his day, the legataries had a right in equity to such portions of his personal chatels, and profits of his whole estate, both of which were in terms chargeable with the legacies, as were equal to that value; and if the executors, willing to act justly towards all the children, had discharged the legacies by delivering those portions of the goods, and of the specific profits, when the one could be spared and the other could be conveniently raised, the court of equity would, as is conceived, have applauded their discretion — conceived, because the court, upon a previous application by them, would probably have authorized the adjustment, unless it seemed precipitate; and will sanctify what it would have authorized, if a stranger be thereby not injured, be this as it may, the court of equity would not, as is believed, have directed the guardian, against his will, to receive the paper money, according to its nominal value at the time of the tenders, and ought not to ratify the receipt, at most no farther than to grant him a quietus from any demand against him, in that character, by his ward, leaving her at liberty to seek satisfaction from those who injuriously withoid it.
• IV. Regal compulsion, an apology which was urged by the defendent Abraham Salle to justify his conduct in receiving the paper money did not exist, he was not compella-ble by law to receive it. the statutes, by authority of which the paper money of this commonwealth had been generated, and that of Congress had been adopted, which declared that it should pass current in all payments, trade, and dealings, and be equal to the same nominal sum in Spanish milled dollars, which inflicted penalties upon those who estimated the metalicand paper monies differently, and which enacted that the paper money should be a lawful tender in payment of all public and private debts — • these statutes did not COMPER any one, whether he would or not, to receive the paper money, — did not, for that purpose, authorise corpuscular violence, — did not declare the duty to be cancelled by refusal,— but proceeded no farther than to make the refusal an extinction of the right to interest. If the guardians fear to incur popular odium, prevailing over his fortitude, compelled him to concur with his colleagues in this flagitious transaction, they, who, practising upon his pusillanimity, led or terrified him into the dilemma, violated their duty, in defeating the design of their testator, and were partial in suffering the guardian of another legalary to elude the same injury meditated against her; and the conduct of all three was a subject meet for praetorian animadversion.
*V. That paragraph of the act of general assembly, passed in the no-vember session of the year 1781, intituled, ‘an act directing the mode of adjusting- and settling the payment of certain debts and contracts, and for other purposes,’ which provided, ‘that in ail cases of payments, in paper currency, of any DEBT, CONTRACT, or OBLIGATION WHATSOEVER, the PARTY paying, or upon whose ACCOUNT the money shall have been paid, shall have full credit for the nominal amount of the payment,’ perhaps doth not comprehend the case of a legacy; for A legacy is not a debt» of the testator. It is, with respect to him, a beneficence, to exaction of which from him the law did not intitlc the legatary, the testator might have revoked it which he could not have done, if a legacy were synonymous with a debt. Besides, the right of the legatary, before the testator’s death, is not perfect, the testator then was not a debtor whilst he lived; and with his existence his power to become a debitor ceased, a legacy is not the debt of an executor, a debt originates ex contractu, which doth not exist between him and the legatary, the executor, by wasting the testators goods, may be. responsible indeed for the value of them, to an unsatisfied legatary ; but here the legacy is not, but reparation for maladministration in his office, is the thing demanded from *178 the executor, the right to demand it originating ex malificio, although the legacy is the measure of that reparation, the words debitum in praesenti solvendum in futuro, often used in cases where the question is whether a legacy was lapsed or not, do not describe the nature of a legacy, but relate only to the time when the legatary right became or would have become complete, obligation, the other term occuring in the paragraph cited, the extent of which is supposed to be defined by the following words, ‘PARTY paying or on whose ACCOUNT the payment shall have been,’ includes an obligation which the party who paid, or on whose account an agent paid, the money, was originaly under obligation to pay the money; but the testator was not under obligation to pay the legacy.*
But this paragraph if it do comprehend the case of a legacy generaly, can apply to the case only, where the payment and receipt being fair, and therefore supposed to be valid acts, the question between the parties is, how much credit ought to be allowed for the payment; not to such a case as this, where the money tendered unnecessarily, injuriously, contrary to the manifest “intention of the testator, money tendered by one entrusted in some measure with the care of all his testators children and their estates, but prompted by an eagerness to enrich some of them by half ruining another, was accepted by her guardian, against his consent, impelled by a false notion, craftily infused or negligently embraced that he was bylaw bound to accept it, or terrified into an apprehension that he durst not refuse it; not to such a case as this, the case of an infant, who ought not, in vain, to supplicate relief in a court of equity.
Upon these considerations, the decree was thought to be so righteous a sentence as that it would be approved, even in that tribunal where a
' Quaesitor Minos urnam movet,
until its damnation was solemnly announced by this act:
At a court of appeals, held at the capítol, in the city of Richmond, the 2 day of No-vember, 1793,
Abraham Salle . Bernard Markham and Edward Moseley, executors of Benjamin Harris deceased, and Benjamin Harris and William Wager Harris, appellants, against William Yates and Sarah his wife, appel-lees.
Upon an appeal from a decree of the high court of chancery, pronounced the twenty sixth day of September, 1792,
This day came the parties, by their coun-sil, and the court, having maturely considered the transcript of the record, and the arguments of the counsil, is of opinion, that the three hundred pounds current money legacy, devised to the appellee Sarah by the will of her father Benjamin Harris, was dischargeable in paper money, at the times the respective sums of one hundred pounds and two hundred pounds were to be paid, according to the will, and the executors of the said will, having actuaiy paid the same accordingly to the guardian of the said Sarah although the paper was" then in a state of depretiation, which rendered the payment very injurious to her, yet she was deprived of any relief by the subsequent act of general assembly, intitled ‘an act directing the mode of adjusting and settling the payment of certain debts and contracts, and for other purposes,’ which directs, that in all cases where actual paj'ments had been made, by any person, or persons, of any sum or sums of the aforesaid paper currency, at any time or times, either to the full amount, or in part payment, of any debt, contract or obligation whatsoever, the party paying the "same, or upon whose account such a sum or sum of money had been actually paid, should have full credit for the nominal amount of such payments, which should not be reduced; that the guardian *of the appellee Sarah being compellable by law to receive the said paper money, and it not appearing that he used the same for his own purposes, but kept part of it by him and lent other part out at interest, which on its being returned, he also kept until it was funded, according to another act of assembly, ought not to be subject to the loss by future depretiation, subsequent to his receipt of the money from the executors, and consequently that the said decree, as also the decree of the first day of June, 1792, are erroneous: therefore it is decreed and ordered, that the same be reversed and annulled, and that the appel-lees pay to the appellants their cost by them expended in the prosecution of their appeal aforesaid here, and this court, proceeding to make such decree, as the said high court of chancery should have pronounced, it is further decreed and ordered that the bill be dismissed, as to the appellants Bernard Markham, Edward Moseley, Benjamin Harris, and Wm. Wager Harris, and that the parties bear their own costs, and the cause is remanded to the said high court of chancery, as to the appellant Salle, the guardian, for an account to be taken of the said money so received by him, according to the principles of this decree, which is ordered ■ to be certified to the said high court of chancery. _

This motive was ascribed to him when the decree was condemned. — Note in edition of 1852.

See decree of reversal at the end. — Note in edition of 1852.

[The Court of Appeals, however, through their President, say, “It is remarkable" that to the words debts and contracts are added, or obligations whatsoever, which comprehend legacies.” 1 Wash. 327.— Ed.] — Note in edition of 1852.